UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. LAWRENCE J. O'NEILL, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )   No. 12-CR-0039-LJO
                                   )
vs.                                )   JURY TRIAL
                                   )     DAY 2
RANDY LEE WILKINS,                 )
                                   )
          Defendant.               )
_____)

Fresno, California                 Thursday, November 14, 2013

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 2, Pages 159 through 235, inclusive

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:          United States Attorney's Office
                            BY: **KIRK E. SHERRIFF**
                            and **GRANT B. RABENN**
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721


For the Defendant:          **SALVATORE SCIANDRA**
                            Attorney at Law
                            2300 Tulare Street
                            Suite 230
                            Fresno, California 93721

1                                    <u>INDEX</u>

2    <u>GOVERNMENT'S WITNESSES</u>:

3     **JOSEPH TKAC**                                              162
     CONTINUED DIRECT EXAMINATION BY MR. SHERRIFF               162
4     CROSS-EXAMINATION BY MR. SCIANDRA                          205

5                                   * * * * *

6

7

8

9

10                                 EXHIBITS

11   <u>DEFENDANT'S</u>                                           **Marked**
       E                                                       216
12

13                                  * * * * *

14
     <u>DEFENDANT'S</u>                                         **Received**
15     E                                                       217

16                                  * * * * *

17

18

19

20

21

22

23

24

25

1    Thursday, November 14, 2013                    Fresno, California

2    8:36 a.m.

3          THE COURT:  Back on the record.  Counsel are present.

4    The jury is being summoned.  Just so counsel know, I'm going

5    to growl at the jury.  We don't start late.  Okay.

6          (The jury entered the courtroom.)

7          THE COURT:  All right.  The jury has joined us.  Good

8    morning, ladies and gentlemen.  Any issues?

9          Okay.  I know that somebody was not on time this

10   morning.  I don't know who.  Doesn't make any difference.  But

11   just remember that if you're late, everybody waits.  So we

12   can't -- it's not a situation where we can fill you in later.

13   So we need to be careful.

14         All right.  The witness on the stand will continue

15   now with the direct.  Mr. Sherriff.

16         MR. SHERRIFF:  Thank you, Your Honor.

17                        **JOSEPH TKAC**,

18   called as a witness on behalf of the Government, having been

19   previously sworn, testified as follows:

20                  CONTINUED DIRECT EXAMINATION

21   BY MR. SHERRIFF:

22   Q.  Good morning, Mr. Tkac.

23   A.  Good morning.

24   Q.  So yesterday you indicated that after the house on Adoline

25   was purchased, there was another purchase.

1    A.   Yes.  That is correct.

2    Q.   Okay.  And what was the next purchase?

3    A.   The house on Ashlan.

4    Q.   Well, let me ask you this.  Was there a purchase of a

5    house on Phillip before the house --

6    A.   Yes, there was.

7    Q.   -- on Ashlan?

8    A.   Yes.

9    Q.   So let's talk about the Phillip house first.  Who proposed

10   that you purchase the house on Phillip?

11   A.   Randy.

12   Q.   And did he explain why?

13   A.   Well, we needed the cash to continue the work on the other

14   house, on the --

15   Q.   On the Adoline house?

16   A.   On the Adoline house.

17   Q.   Okay.  Now, was the house on Phillip bought with 100

18   percent financing?

19   A.   Yes.

20   Q.   How was -- did Randy Wilkins explain how he was going to

21   get cash from buying a house with 100 percent financing?

22   A.   No.  I don't remember how that was going to work out.

23   Q.   But there was some way where there was going to be some

24   cash back?

25   A.   Yes.

1    Q.  Okay.  Let me show you what's been marked as Government

2    Exhibit 2-D.  And if I can approach, Your Honor, and --

3         THE COURT:  Sure.

4         MR. SHERRIFF:  Thank you.  Excuse me, Your Honor,

5    we're having trouble with the binder here.

6    Q.  Okay.  So looking at Exhibit 2-D, Mr. Tkac, is that

7    your -- are those your initials down at the bottom?

8    A.  Yes, they are.

9    Q.  Okay.  And on each of the subsequent pages?

10   A.  Yes, I can see that, yes.

11   Q.  Okay.  And going through to the last page, actually

12   several of the last pages, is that your signature down at the

13   bottom?

14   A.  Yes, it is.

15   Q.  On several of those pages?

16   A.  Yes.

17   Q.  All right.  Is this a loan application that you signed for

18   the Phillip property?

19   A.  Yes.

20   Q.  Now, who was with you when you signed this document?

21   A.  Would have been Randy.

22   Q.  And why do you say that?

23   A.  Because he was always there whenever we did signing.

24   Q.  Whenever you filled out any paperwork?

25   A.  Yes.

1  Q.  He was always there?

2  A.  Yes.

3       MR. SCIANDRA:  I'm going to object.  That misstates

4  the answer to the question, Your Honor.

5       THE COURT:  The question was:

6       "Now, who was with you when you signed this document?

7       "Would have been Randy.

8       "Question.  Why do you say that?

9       "Answer:  Because he was always there whenever we did

10      signing.

11      "Question:  Whenever you filled out any paperwork?

12      "Answer:  Yes."

13      It's --

14      MR. SCIANDRA:  I'll withdraw the objection.

15      THE COURT:  All right.

16  BY MR. SHERRIFF:

17  Q.  Mr. Tkac, I'm going to show you the next document -- well,

18  it's actually -- if you could hold that page and then flip to

19  tab 3 for Exhibit 3.  And that's a loan application.  And I

20  want to show you down at the bottom, are those your initials

21  on that, on the first page?

22  A.  Yes, they are.

23  Q.  And turn the each of the subsequent pages, are those your

24  initials --

25  A.  Yeah.

1    Q.   And your signature -- yes?

2    A.   Yes, they are.

3    Q.   And on page -- well, it's page 3 of 4 on this one, is that

4    your signature?

5    A.   Yes, it is.

6    Q.   Now, looking at this loan application, it's in the amount

7    of $84,040?

8    A.   Yes.

9    Q.   Concerning the property at 2271 South Phillip Avenue?

10   A.   Yes.

11   Q.   And is that also a loan application that you signed for

12   the Phillip property?

13   A.   Yes, it is.

14   Q.   Okay.  And was Mr. Wilkins also with you when you signed

15   this document?

16   A.   Yes, he was.

17   Q.   Now, you see -- let me ask you this:  One is for $326,160

18   and one is for $84,040.  Do you see that?

19   A.   I can see that, yes.

20   Q.   Why were there two loan applications in two different

21   amounts?

22   A.   There were two different loans.

23   Q.   Was one an 80 percent loan?

24   A.   Yes.

25   Q.   And one was the 20 percent loan?

1   A.   That's correct.

2   Q.   And that was collectively the amount of the purchase

3   price --

4   A.   Yes.

5   Q.   -- that was being borrowed?

6   A.   That's correct.

7   Q.   Okay.  Why were -- on both of these applications, why was

8   the box checked property will be primary residence?

9   A.   Because that's what I was told to do.

10  Q.   By?

11  A.   By Randy.

12  Q.   And did he explain why he was telling you to check the

13  primary residence box?

14  A.   Because that's how we would get the financing.

15  Q.   And did he explain why it would be better -- or why you

16  should check the primary residence box versus one of the other

17  two boxes there, like the investment box?

18  A.   Because we would qualify for that financing if it was a

19  primary residence.

20  Q.   And what if the investment box was checked?

21  A.   I don't know.  Because I never asked.  I mean, that was

22  never brought up in the conversation.

23  Q.   He just told you that the primary residence box would be

24  checked?

25  A.   Yes.

1  Q.  Because that's how you get the financing?

2  A.  That's correct.

3  Q.  Now, that wasn't true; right?  That it was going to be a

4  primary residence.

5  A.  No, it was not going to be.

6  Q.  Why were you and he buying the house?

7  A.  We were going to re-sell it.

8  Q.  Was it for an investment purpose?

9  A.  Yes, it was.  Yes.

10  Q.  Now, if you look on the second page of each application.

11  And you can look -- I'll show you both on the screen, but if

12  you're on Exhibit 3, if you could turn to page 2.  Or may I

13  approach, Your Honor?

14          THE COURT:  Sure.

15  BY MR. SHERRIFF:

16  Q.  On 2-D, page 2.

17  A.  Okay.

18  Q.  Do you see on the monthly income section --

19  A.  Yes, I see that.

20  Q.  -- that the employment for you is listed as $11,975 a

21  month?

22  A.  Yes, I see that.

23  Q.  Was that true?

24  A.  No, it was not.

25  Q.  Why was it listed there?

1  A.  I really don't -- I don't know what you're talking about

2  here.  I mean --

3  Q.  Well, why was the wrong income amount listed there instead

4  of the true income amount?

5  A.  Apparently to qualify for the loan.

6        MR. SCIANDRA:  I'm going to object, Your Honor.

7  Speculation.

8        THE COURT:  Sustained as phrased in the answer.

9  Stricken.

10  BY MR. SHERRIFF:

11  Q.  Did Randy Wilkins talk to you about the amount of income

12  that you had to have on the loan application?

13  A.  Yes, he did.

14  Q.  And what did he say?

15  A.  He said that I would have to have more income to qualify.

16  Q.  And if you listed your true income, you wouldn't qualify?

17  A.  Yes, that's correct.  I would not have qualified for that

18  income.

19  Q.  You had that discussion with Randy Wilkins?

20  A.  Yes, I did.

21  Q.  Now, I'm going to show you the third page.  If you'd just

22  turn to the next page of that loan application.  And do you

23  see that on both of these loan applications, there's a listing

24  of two properties that were owned.

25  A.  Yes, I do.

1    Q.   One was Pinedale Avenue, 6197 Pinedale.

2    A.   Yes.

3    Q.   And one was 1405 North Adoline Avenue.

4    A.   Yes.

5    Q.   And was Pinedale your primary residence?  That's where you

6    actually lived?

7    A.   Yes, it was.

8    Q.   And that's where you lived throughout this whole time

9    period?

10   A.   That's correct.

11   Q.   That was always your primary residence?

12   A.   Yes, it was.

13   Q.   As for 1405 North Adoline Avenue, that's the property you

14   just previously purchased?

15   A.   Yes.  It was.

16   Q.   Now, on both of these, do you see that there's a listing

17   there that there's rental income for both of those properties.

18   A.   Yes, I see that.

19   Q.   Now, were either of those properties rented out?

20   A.   No, they were not.

21   Q.   So that was false to list the rental income on those

22   properties.

23   A.   That is correct.

24   Q.   Do you know why that rental income was listed on there if

25   it was false?

1   A.  Well, it was, again, to adjust income for the ability to

2   buy the new house.

3   Q.  Okay.  So meaning that if you didn't have rental income

4   coming in, then it would have looked that you had mortgage

5   payments to pay on those properties without any offsetting

6   income?

7   A.  Yes.

8   Q.  Okay.  Did you discuss that with the defendant?

9   A.  I don't remember.

10  Q.  Now, down, again, coming back to primary residence.  Do

11  you see on each of these, on page 3, there's a box in the

12  declaration section.  Do you intend to occupy the property as

13  your primary residence?  Do you see that?

14  A.  Yes, I do.

15  Q.  Okay.  And that's in the declaration section, that's a

16  little L?  Is that right?

17  A.  It is a what now?

18  Q.  It's lettered -- you know, they're A through M --

19  A.  Okay.  Yes.

20  Q.  -- and it's letter L?

21  A.  Yes, I see that.

22  Q.  And you see that it's checked yes?

23  A.  Yes, I do.

24  Q.  And that was false?

25  A.  Yeah, that was not correct.

1    Q.  Was not correct.  It should have been checked no.

2    A.  That's correct.

3    Q.  Because these were actually being purchased as investment

4    property.  This was actually being obtained for an investment

5    purpose.

6    A.  Yes, they were.

7    Q.  Now, Mr. Tkac, I'm going to ask you to take a look at

8    Government Exhibit 2-F.  And if I -- I can approach, Your

9    Honor.

10            THE COURT:  Sure.

11   BY MR. SHERRIFF:

12   Q.  Now, is that the settlement statement or HUD-1 for the

13   South Phillip Avenue purchase?

14   A.  Yes, it is.

15   Q.  And did that settle or close on August 31, 2006?

16   A.  Yes, it did.

17   Q.  That's the date you purchased the property?

18   A.  That's correct.

19   Q.  And the loan was funded?

20   A.  Yes.

21   Q.  Now, was there an amount listed on there -- was there an

22   amount listed on there at the bottom of $3,414.88 that

23   indicates it's to go back to the borrower?

24   A.  Yes, I see that.

25   Q.  Okay.  I'm going to show you next Government Exhibit

1    2-L-1.  Do you see that?

2    A.  Yes, I do.

3    Q.  Okay.  I could show you -- it's on the screen, but you can

4    also turn to 2-L-1 in the book if you like.

5    A.  Uh-huh.

6    Q.  Now, is that a check you received?

7    A.  Yes.

8    Q.  It's a check payable to you?

9    A.  Yes, it was.

10   Q.  For 3,414.88.  Now, if you look at the second -- the back

11   side.  Do you see where it says -- well, there's a signature

12   up above.  Who's that?

13   A.  That's mine.

14   Q.  And then what does it say right below that?

15   A.  "Pay to the order of JR Properties."

16   Q.  And whose signature is right below that?

17   A.  That's Randy's.

18   Q.  And so this check is -- this is not an amount that you

19   kept in your account?

20   A.  No.  It was not.

21   Q.  What did you do with it?

22   A.  I gave it to Randy.

23   Q.  And why did you give it to Randy?

24   A.  Because it was -- it was going to go to our account.  I'm

25   sorry, with the --

174

1    Q.   The JR Properties account?

2    A.   The JR account.

3    Q.   Which you weren't actually on the JR Properties account;

4    right?

5    A.   No, I was not.

6    Q.   You weren't a signatory to that account?

7    A.   No, I was not.

8    Q.   It wasn't an account you had any access to?

9    A.   No, I did not.

10   Q.   It was the defendant Randy Wilkins and his wife Janelle

11   Wilkins who had access to that account?

12   A.   That's correct.

13   Q.   Now, let me show you, if you look back at the settlement

14   statement.  You indicated the closing was August 31, 2006.

15   A.   Yes.

16   Q.   And who was the mortgage broker on this transaction?

17   A.   Would have been -- I'm sorry.

18   Q.   Was it the individual who Mr. Wilkins knew in Santa Rosa?

19   A.   Yes.

20   Q.   And that you didn't know before Mr. Wilkins brought you

21   into this -- these transactions?

22   A.   I did not know him, no.

23   Q.   Okay.  Do you recall that it was Mr. Ebright?

24   A.   Yes, it was.

25   Q.   That's the name of the individual --

1   A.   Yes.

2   Q.   -- that Mr. Wilkins knew?

3   A.   Yes, it was.

4   Q.   Okay.  Showing you Government Exhibit 2-J-1.  Do you see

5   that check dated a day after the closing?

6   A.   Yes, I see that.

7   Q.   For $2500.

8   A.   Yes.

9   Q.   Do you know why Mr. Ebright was paying the defendant Randy

10  Wilkins $2500 as a customer refund?

11  A.   No, I don't know.

12  Q.   Did Mr. Wilkins explain he was getting a customer refund

13  back from Anthony Ebright?

14  A.   No, I did not know that.

15  Q.   Okay.  If you look at the endorsement side on the second

16  page.  Do you recognize that signature?

17  A.   That's Randy Wilkins.

18  Q.   Now, a few days later -- I'm going to show you Government

19  Exhibit 2-I-1.  And do you see that?  That's a check dated a

20  few days later.  September 7th, 2006.

21  A.   Yes, I see that.

22  Q.   And do you know -- and you see that that appears to be

23  from Anthony Ebright.

24  A.   Yes, it is.

25  Q.   Do you know why Mr. Ebright was sending a check to Randy

1  Wilkins/JR Properties in the amount of $16,169.74 a few days

2  after the closing of this transaction?

3  A.  No, I don't know.

4  Q.  You see where it says "client refund" slash -- does it say

5  "loan"?

6  A.  I see that, yes.

7  Q.  Did Mr. Wilkins discuss with you that he was getting money

8  back from Anthony Ebright on this transaction?

9  A.  Not from him.  No, I thought we were getting money from

10  the original --

11       MR. SCIANDRA:  I'm going to object, Your Honor.

12       THE WITNESS:  -- mortgage.

13       MR. SCIANDRA:  Nonresponsive to the question.

14       THE COURT:  Sustained.  The question is did Mr.

15  Wilkins discuss with you that he was getting money back from

16  Anthony Ebright on this transaction?

17       THE WITNESS:  No, I did not.

18  BY MR. SHERRIFF:

19  Q.  No, he did not discuss that with you?

20  A.  No, he did not.

21  Q.  And I'm going to ask you to take a look at the second

22  page, the endorsement page.  Back side.  Do you recognize that

23  signature?

24  A.  That's Randy 's.

25  Q.  Okay.  Now, Mr. Tkac, after the Phillip property closed

1  and you guys owned that property on Phillip as well as the one

2  on Adoline, was there another property transaction?

3  A.   Yes, there was.

4  Q.   Okay.  And did the defendant propose to you that you do

5  that transaction?

6  A.   Yes, he did.

7  Q.   Okay.  And what did he propose you do?

8  A.   To finance or to enter into an agreement to buy the house.

9  Q.   Was that the house on Ashlan that you referred to earlier?

10  A.   Yes, it was.

11  Q.   Okay.  Who found that house?

12  A.   Randy had.  Randy had found that.

13  Q.   He was the one dealing with the real estate agent to find

14  the house?

15  A.   Yes.

16  Q.   Or at least primarily?

17  A.   Yes.

18  Q.   And what was the purpose of that house purchase?

19  A.   To buy it, to continue the other -- keeping up on the

20  other houses.

21  Q.   Was it -- for this investment purpose of JR Properties?

22  A.   Yes, it was.

23  Q.   I'm going to show you a document marked 1-F-3.  Can I

24  approach, Your Honor?

25          THE COURT:  Sure.

1   BY MR. SHERRIFF:

2   Q.   Now, Mr. Tkac, if you look at that document, down at the

3   bottom -- well, first of all, is that another loan

4   application?

5   A.   Yes, it is.

6   Q.   Is that your signature at the top of the first page?

7   A.   Yes, it is.

8   Q.   And is that your signature down -- I'm sorry, your

9   initials at the bottom?

10  A.   Yes, they are.

11  Q.   And on all the subsequent pages, they are your initials?

12  A.   Yes, they are.

13  Q.   And with the exception of page 4, which is -- is that your

14  signature again?

15  A.   Yes, it is.

16  Q.   Okay.  And did you sign this approximately on November

17  9th, 2006?

18  A.   Yes.  I did.

19  Q.   Is this a loan application that you signed in connection

20  with getting a loan for the purchase of 310 East Ashlan Avenue

21  in Fresno?

22  A.   Yes, it is.

23  Q.   And who was present with you when you signed that loan

24  application?

25  A.   It would have been Randy.

1   Q.   Well, was it Randy?

2   A.   It was Randy, yes.

3   Q.   Okay.  And let's look at a couple of things that are on

4   there.  Do you see the box is marked "property will be primary

5   residence"?

6   A.   I see that.

7   Q.   That's as it was on Phillip as well?

8   A.   Yes.

9   Q.   Okay.  Why was that box checked on here, this time?

10  A.   For the same reason, because that's -- I would have to

11  have that kind of -- I'm sorry.

12  Q.   What -- let me step back.  So there's a primary residence

13  box versus an investment box or a secondary residence box.

14  Why was the primary residence box checked?

15  A.   To qualify for the loan.

16  Q.   And who explained that to you?

17  A.   Randy would have done that.  Randy did that.  Yes.

18  Q.   All right.  Mr. Wilkins --

19  A.   Yes.

20  Q.   -- explained to you that you'd qualify to put primary

21  residence, but not if you didn't have that checked?

22  A.   Yes.

23  Q.   Now, let me ask you about the income again.  Well, just to

24  be clear.  That "primary residence" box being checked.  That

25  was false; right?

Tkac  P.

1    A.   That -- yes, it was not -- it was not true.

2    Q.   Okay.  Because -- was that because you and Mr. Wilkins

3    were buying this for an investment purpose --

4    A.   Yes, we were.

5    Q.   -- for JR Properties?

6    A.   Yes.

7    Q.   And how about the base employment income listed in the

8    income section.  That's the same amount that was listed on

9    Phillip approximately, 11,875 in this case.  Was that your

10   correct income at the time?

11   A.   No.  It was not.

12   Q.   Why was an amount listed that was not your correct income?

13   A.   I was told that we could not qualify -- I could not

14   qualify for the loan unless I had that kind of income.

15   Q.   And who told you that?

16   A.   Randy.

17   Q.   Now, the next page, there's a section where it lists the

18   real estate owned, just like on the other application.  And do

19   you see that at the bottom?

20   A.   Yes, I do.

21   Q.   On page 3.  I'm sorry.  Page 2 of 5.  It looks to be.  I'm

22   sorry.  Maybe 3 of 5.  And do you see that there's a property

23   listed at 61 -- is it 6167?  On Pinedale?

24   A.   Yes.

25   Q.   Okay.  And that that property is listed.

1   A.   Yes, it does.

2   Q.   The Adoline property is not listed; is it?

3   A.   No, it is not.

4   Q.   But you still owned it at this time; right?

5   A.   Yes.

6   Q.   And you owed mortgage payments on that property at this

7   time?

8   A.   Yes, I did.

9   Q.   The Phillip property is also not listed.

10   A.   It is not.

11   Q.   And you owned Phillip at this time.

12   A.   Yes.

13   Q.   And owed mortgage payments at this time.

14   A.   Yes, I did.

15   Q.   Why weren't those properties listed on the loan

16   application?

17   A.   I don't know.

18   Q.   I'm going to ask you to turn to the next page.  And this

19   page has the section in the declaration section where there's

20   little letters A through L.  And again, in section L, it says,

21   "Do you intend to occupy the property as your primary

22   residence?"  Do you see that?

23   A.   Yes, I do.

24   Q.   And the "yes" box is checked.

25   A.   Yes.

Case 1:12-cr-00039-LJO-BAM   Document 59   Filed 12/18/13   Page 24 of 77

1  Q.  And that was also false?

2  A.  That was not true, yes.

3  Q.  That was not true.  Now, do you see that there's a box

4  right below that that says, "Have you had an ownership

5  interest in a property in the last" -- looks like five years.

6  I'm sorry.  Three years.  Hard to read.  Do you see that?

7  A.  Yes, I do.

8  Q.  And there's a box that's checked.

9  A.  Yes, it does.

10  Q.  And then it asks below, "What type of property did you

11  own, principal residence, second home or investment property?"

12  Do you see that?

13  A.  Yes, I do.

14  Q.  And "PR" is written there for personal residence.

15  A.  Yes.

16  Q.  That was partly true; right?  Because you owned a personal

17  residence on Pinedale.

18  A.  Yes, I did.

19  Q.  But you also owned investment properties.

20  A.  Yes.

21  Q.  And that wasn't disclosed there.  Right?  "IP" wasn't

22  written there for investment property?

23  A.  Okay.

24  Q.  Do you see that?

25  A.  Well, I don't know what it really means.  I mean, yes, I

1   belonged -- I owned a property, my own home.  Were there -- is

2   this supposed to be like two choices or --

3        THE COURT:  Well, wait.  He's the one that has to ask

4   the questions.

5        THE WITNESS:  Okay.

6   BY MR. SHERRIFF:

7   Q.  Did you understand -- let me ask you this:  Going back to

8   the prior page.  You understand that in the real estate owned

9   section, it's asking you what real estate you owned.

10  A.  Yes.

11  Q.  And that investment properties that you owned should have

12  been disclosed there.

13  A.  Yes.

14  Q.  Including Adoline and Phillip.

15  A.  Yes.

16  Q.  Those were the two properties you owned.

17  A.  Okay.  Yes.

18  Q.  Okay.  Now, on this property -- let me show you what's

19  been marked as 1-F-9.  It's in evidence.  And it's a HUD-1

20  settlement statement.  Do you see that the name of the

21  borrower, Joseph Tkac, is listed on there?

22  A.  Yes, I see that.

23  Q.  And that the property location is 310 East Ashlan Avenue.

24  A.  Yes.

25  Q.  Okay.  Do you see that where it says "Settlement date,

1   11-15-06"?

2   A.  Yes.

3   Q.  Is that the date approximately that the transaction closed

4   and that you bought the property on Ashlan Avenue?

5   A.  Yes.

6   Q.  Okay.  Now, do you see an indication on here, line 201, of

7   deposit or earnest money of 504.21?

8   A.  Yes.

9   Q.  And that there's also a deposit line on the other side of

10  655.61.  You see those?

11  A.  I do, yes.

12  Q.  Do you know who made those deposits?

13  A.  No, I do not.

14  Q.  I'm going to show you what's been marked as Government

15  Exhibit 1-F-7.  Do you see that there's a cashier's check

16  there?

17  A.  Yes, I see that.

18  Q.  States on it that it was -- states that it was purchased

19  by Randy Wilkins.  Do you know why Mr. Wilkins was making a

20  check to Stewart Title on November 14th of '06 in this amount

21  of 1,159.82?

22  A.  No, I do not.

23  Q.  Now, do you see at the top of that receipt that

24  655 -- listing of 655.61?

25  A.  Yes, I see that.

1  Q.  And then on the second page, 504.21?

2  A.  I see that.

3  Q.  How's your math?

4  A.  Horrible.

5  Q.  Okay.  Do a quick math, does it appear that those numbers

6  total up to the amount of the cashier's check that states it

7  was purchased by Randy Wilkins?

8  A.  That looks close, yes.

9  Q.  Okay.  Were you aware that on these transactions, some

10 deposit amounts had to be put in at the beginning of the

11 transaction at times?

12 A.  Yes.

13 Q.  Okay.  Do you know why Mr. Wilkins would put the deposit

14 down for your purchase?

15 A.  Well, his name specifically, I don't know why, no.

16 Q.  I mean, you were buying this as part of the partnership?

17 A.  Yes, we were.

18 Q.  Okay.  Now, that transaction closed on -- the date of the

19 settlement statement was 11-15-06.  Right?

20 A.  Yes.

21 Q.  That's when you purchased the property on Ashlan.

22 A.  Yes.

23 Q.  Now, let me show you a check.  It's marked Exhibit 1-F-4.

24 And actually, can I approach, Your Honor?

25          THE COURT:  Yes.

1  BY MR. SHERRIFF:

2  Q.  Now, do you see that check?

3  A.  Yes, I do.

4  Q.  It indicates it's from the JR Properties and Investments

5  account.

6  A.  Yes.

7  Q.  Whose signature is that on the check?  On the front page?

8  A.  It would be Randy.

9  Q.  Do you recognize it as Randy Wilkins?

10  A.  Yes, I do.

11  Q.  To the left of that, on the re line, does that say "to

12  show funds availability for 310 East Ashlan"?

13  A.  Yes.  It does.

14  Q.  Is this a check -- well, did you receive this check?

15  A.  Yes, I did.

16  Q.  Is this a check you deposited into your account?

17  A.  Yes, I do.

18  Q.  Okay.  Are you aware that -- I'm showing you Government

19  Exhibit 1-F-5.  That on October 30th, approximately, a

20  verification of deposit was done to verify the funds you had

21  on deposit in your account?

22  A.  Yes, I see that.

23  Q.  Was that in connection with the loan application you were

24  making for 310 Ashlan?

25  A.  Yes, it was.

1    Q.  And that was dated -- that verification was dated -- do

2    you see that -- October 30th, 2006?

3    A.  Yes, I see that.

4    Q.  Did you write this check the following day, October 31,

5    2006?

6    A.  Yes, I did.

7    Q.  And that's in the amount of $10,000?

8    A.  Yes, it is.

9    Q.  The same amount as the check that Mr. Wilkins had written

10   to you a few weeks earlier?

11   A.  Yes.

12   Q.  And does it -- is that your handwriting on the re line,

13   where it says "return from Ashlan statement"?

14   A.  Yes.

15   Q.  Is that your signature?

16   A.  Yes, it is.

17   Q.  Okay.  Why did you write this check to Mr. Wilkins for

18   $10,000?

19   A.  To reimburse the account for -- that had already been

20   deposited in my account.

21   Q.  Were you reimbursing him the $10,000 that he'd sent you on

22   the check on October 5th, 2006?

23   A.  Yes.

24        MR. SCIANDRA:  Objection.  Misstates the answer, Your

25   Honor.

1        THE COURT:  The question does not encompass the last
2   answer.
3   BY MR. SHERRIFF:
4   Q.  And why had Mr. Wilkins -- well, let me ask you this:  Was
5   the purpose of this check for Mr. Wilkins as written there on
6   the re line on the check for Mr. Wilkins?
7   A.  Excuse me?
8   Q.  Do you see what's written on the memo line, "to show funds
9   availability for 310 East Ashlan"?
10  A.  Yes.  Yes.
11  Q.  Was that the reason for you getting this $10,000 from him?
12  A.  Yes, it was.
13  Q.  Did he discuss that with you in more detail?  Randy
14  Wilkins.
15  A.  That we -- that we needed to have more money in my account
16  to qualify.
17  Q.  Is that what he said?
18  A.  Yes.
19  Q.  Okay.  Did he explain why you needed to have more money in
20  your account to qualify?
21  A.  Specifically, no.  Just that we had to have money in the
22  account to qualify.
23  Q.  Or else you wouldn't have qualified for the loan?
24  A.  Probably would not have qualified.
25  Q.  And then after the verification was done, on October 30th,

Case 1:12-cr-00039-LJO-BAM  Document 59  Filed 12/18/13  Page 31 of 77

1  2006, you repaid that money to him?

2  A.  Yes, I did.

3  Q.  Now, looking at the settlement statement, the HUD-1,

4  1-F-9.  Do you see at the bottom that there's an entry on the

5  left that says "cash to borrower"?

6  A.  Yes, I see that.

7  Q.  Payment to borrower, 410.88.

8  A.  Yes.

9  Q.  Okay.  I'm going to show you a check for 410.88.  And do

10  you see that?

11  A.  Yes, I do.

12  Q.  Is that -- appears to be a Stewart Title check to you.

13  A.  Yes.

14        THE COURT:  Is that marked?

15        MR. SHERRIFF:  I'm sorry?

16        THE COURT:  Is that marked?

17        MR. SHERRIFF:  Yes, it is.  1-F-11, Your Honor.

18  Excuse me.

19  Q.  Did you receive that check?

20  A.  I guess I did.

21  Q.  Okay.  Well, if you don't recall, I don't want you to

22  speculate.

23  A.  No, I don't know.

24  Q.  Okay.  If you --

25  A.  I don't remember.

1   Q.  -- did receive such a check, what would you do with them?

2   What did you do with them when you did receive such checks?

3   A.  I would put it in my account.

4           THE COURT:  One at a time.  We need to talk one at a

5   time.  What's your question?

6   BY MR. SHERRIFF:

7   Q.  Let me ask it this way.  If you received a check in the

8   amount -- back on Ashlan -- of 410.88, what -- what would you

9   have done with that at that time?

10  A.  I would have put it either in my personal account or I

11  would have put it in the account for JR Properties.

12  Q.  Okay.  And you didn't have access to the account so you

13  would have had -- to JR Properties, you would have to give

14  that to either the defendant or his wife to deposit into the

15  JR Properties account?

16  A.  Yes, that is correct.

17  Q.  Okay.  And turning to the second page of 1-F-11.  Do you

18  see that there's a -- appears to be a transaction envelope

19  noting checks totaling 420.88.

20  A.  Yes, I see that.

21  Q.  Okay.  With a name Janelle Wilkins and an account number.

22  A.  Yes, I see that.

23  Q.  That's not your account number?

24  A.  Which account?

25  Q.  Your personal account.

1    A.   No, it's not my personal account, no.

2    Q.   It's not any of your personal accounts.

3    A.   No.

4    Q.   Do you recognize that as being the JR Properties account

5    number?

6    A.   No, I don't remember.

7    Q.   You don't know the JR Properties account number?

8    A.   No, I don't.

9    Q.   Okay.  Now, I'm going to show you another check.  It's

10   marked Government Exhibit 1-F-12.  And do you see that that's

11   a check dated November 17th, 2006?

12   A.   Yes, I see that.

13   Q.   Appears to be from Anthony Ebright.

14   A.   Yes.

15   Q.   And do you see what's listed on the memo line.

16   A.   It says "Tkac refund."

17   Q.   Did you get that check yourself?

18   A.   No, I did not.

19   Q.   Do you know why -- well, let me step back a second.  So

20   this initial Ashlan purchase, again, settled on -- closed on

21   November 15th, 2006.  Is that right?

22   A.   Yes.

23   Q.   And do you know why, two days later -- well, was Anthony

24   Ebright the mortgage broker that handled the 310 East Ashlan

25   purchase?

1    A.  Yes, he was.

2    Q.  That was the individual that Mr. Wilkins knew from Santa

3    Rosa?

4    A.  Yes, he is.

5    Q.  And did Mr. Wilkins have all the deals go through Mr.

6    Ebright in Santa Rosa?

7    A.  Yes, he did.

8    Q.  Even though the transactions were here in Fresno?

9    A.  Yes.

10   Q.  Now, do you see -- well, do you know why two days after

11   the Ashlan purchase went through, Mr. Ebright would be sending

12   a check to Randy Wilkins for $3100?

13   A.  No, I would not.

14   Q.  Listing "Tkac refund."

15   A.  I would not know.  No.

16   Q.  You don't know?

17   A.  No.

18   Q.  Did Mr. Wilkins tell you that he'd received those funds as

19   a Tkac refund from the mortgage broker who just handled the

20   transaction in your name?

21   A.  No, he did not.

22   Q.  Okay.  Mr. Tkac, after the -- at the time of the Ashlan

23   purchase, so we're in -- that purchase, again, closed right on

24   about November 15th, 2006?

25   A.  Yes.

Case 1:12-cr-00039-LJO-BAM   Document 59   Filed 12/18/13   Page 35 of 77

1  Q.  Did Mr. Wilkins, Randy Wilkins, propose another

2  transaction related to Ashlan?

3  A.  Yes, he did.

4  Q.  And what was that?

5  A.  To get another loan against that property so that we could

6  do some re -- I'm sorry -- reconditioning on the house.

7  Q.  Reconditioning or remodeling?

8  A.  Yes.

9  Q.  Okay.  And what kind of loan -- was it a refinancing type

10  loan that he was proposing?

11  A.  Yes, it was.

12  Q.  Was that, again, for an investment purpose?

13  A.  Yes, it was.

14  Q.  And did you -- well, let me show you a document.  Exhibit

15  4-B.  Can I approach, Your Honor?

16          THE COURT:  Sure.

17  BY MR. SHERRIFF:

18  Q.  Mr. Tkac, at the top, is that your signature?

19  A.  Yes, it is.

20  Q.  And down at -- I'm going to turn to page 4 of 5 and 5 of

21  5.  Are those your signatures?

22  A.  Yes, they are.  Yes.  Both of them are.

23  Q.  Okay.  Now, and is that approximately the date you signed

24  it, December 8th, 2006?

25  A.  Yes, it is.

Tkac - P

194

1   Q.   Okay.  Is this a loan application that you signed?

2   A.   Yes, it is.

3   Q.   All right.  And did it relate to 310 East Ashlan Avenue?

4   A.   Yes, it did.

5   Q.   And that was --

6        MR. SCIANDRA:  Excuse me.  Can I have the exhibit

7   number?

8        MR. SHERRIFF:  I'm sorry, it's 4-B.

9        MR. SCIANDRA:  Thank you.

10  BY MR. SHERRIFF:

11  Q.   Mr. Tkac, is that loan application in the amount of

12  $250,000, is that a loan application you did as part of this

13  refinancing that you were just discussing?

14  A.   Yes, it is.

15  Q.   Okay.  Who was with you when you signed that loan

16  application?

17  A.   Randy.

18  Q.   Randy Wilkins, the defendant?

19  A.   Yes.  That's correct.

20  Q.   And do you see on the upper part of the right side of the

21  first page, it says "property will be primary residence."  And

22  that box is checked.

23  A.   Yes, I see that.

24  Q.   That was not true; was it?

25  A.   No, it was not.

1   Q.  Why was that box checked as primary residence on this loan

2   application?

3   A.  I don't remember.

4   Q.  Well, was it for the same reasons as had been checked on

5   the prior applications?

6       MR. SCIANDRA:  Objection, Your Honor.  He just said

7   he didn't remember.

8       THE COURT:  He's permitted to attempt to refresh.

9   Overruled.

10  BY MR. SHERRIFF:

11  Q.  Do you recall that, with respect to the earlier Ashlan

12  application, you indicated there was a reason to check primary

13  residence because of the loan terms?

14  A.  Yes.  Yes.

15  Q.  Was it -- does that help you recall the reason for it

16  being checked here?

17  A.  Yes.

18  Q.  And what was the reason for it being checked on this

19  application?

20  A.  Again, for the qualifying the loan as a primary residence

21  as opposed to an investment.  Yes.

22  Q.  Is that, again, as with the other loans, something that

23  the defendant told you?

24  A.  Yes, it is.

25  Q.  Now, I'm going to ask you to look on to page 2.  And do

1   you see where it says "monthly income" in the middle of the

2   page?

3   A.   Yes, I do.

4   Q.   And $11,975 a month is listed here.

5   A.   Yes, I see that.

6   Q.   And that was not true at that time.

7   A.   That's correct.  It was not.

8   Q.   And was that listed there for the same reason as on the

9   other loan applications that you discussed?

10   A.   Yes.

11   Q.   Was that something that the defendant discussed with you

12   in this loan application --

13   A.   Yes, it is.

14   Q.   The need for that?

15   A.   Yes.

16   Q.   And what was the need that he explained you would have to

17   have that on the application?

18   A.   In order to get the loan I would have to have that kind of

19   income.

20   Q.   And if you listed your true income, you would not have

21   qualified?

22   A.   I assume not.  No, I would not have qualified.

23   Q.   And let me ask you to turn to the next page where there's

24   a schedule of real estate owned.  And do you see that the

25   Pinedale Avenue address is listed.

1  A.  Yes, it does.

2  Q.  But the Adoline house is not listed.

3  A.  No, it is not.

4  Q.  And you did own the Adoline house at this time.

5  A.  Yes, I did.

6  Q.  And the Phillip Avenue house is not listed.

7  A.  It is not.

8  Q.  And you did own the Phillip house still at this time.

9  A.  Yes, I did.

10 Q.  And on both of those houses, you had monthly mortgage

11 payments that were in your name at least?

12 A.  Yes, I did.

13 Q.  Was the -- okay.  Let me ask you this now.  The mortgage

14 payments on all of these properties, now you had -- let me

15 come to that in a second.

16      So we have a transaction -- loan application on

17 Ashlan for this refinance.  Let me show you what's been marked

18 as Government Exhibit 4-C.  And do you see that your name is

19 listed in the upper left as the name and address of the

20 borrower?

21 A.  Yes.

22 Q.  Is that -- the address is 310 East Ashlan?

23 A.  I see that, yes.

24 Q.  And property location, 310 East Ashlan?

25 A.  Yes.

Tkac - P

1  Q.  And do you see that down at the bottom, a loan amount is

2  listed of $250,000.

3  A.  I see that.

4  Q.  Is this the settlement statement that relates to that home

5  equity loan that you obtained on Ashlan, the second loan?

6  A.  Yes.

7  Q.  Okay.  For $250,000?

8  A.  Yes.

9  Q.  Now, do you see that there was an amount that was payable

10  to the borrower.

11  A.  Yes.

12  Q.  176,855.19.

13  A.  Yes.

14  Q.  Did you receive that money personally?

15  A.  No, I did not.

16  Q.  I'm going to show you what's been marked as Government

17  Exhibit 4-E.  And down at the bottom, this is -- if you look

18  at the top, it's closing instructions, Tkac, it states.

19  A.  Okay.

20  Q.  And this is page 5 of 5.  Is that your handwriting at the

21  bottom?

22  A.  Yes, it is.

23  Q.  And is that handwriting that indicates that -- states wire

24  transfer authorization at the top of the section, not in your

25  handwriting, but in type.

1    A.  Yes, I see that.

2    Q.  Do you see the name of the bank listed is Educational

3    Employees Credit Union?

4    A.  Yes, it is.

5    Q.  And you didn't have a personal bank account at Educational

6    Employees Credit Union?

7    A.  No, I did not.

8    Q.  Was the JR Properties & Investments account at EECU,

9    Educational Employees Credit Union?

10   A.  Yes, it was.

11   Q.  Was this -- you filling this out to have those funds

12   transferred to the EECU account?

13   A.  Yes, that's what it says.

14   Q.  Why did you do that?

15   A.  That was our agreement.

16   Q.  Whose agreement?

17   A.  The -- with Randy and Janelle and myself as far as doing

18   the real estate loans.

19   Q.  The agreement that the defendant had with you was that all

20   of the money would go into the JR Properties account?

21   A.  Yes.

22   Q.  And that you wouldn't have that money that came on your

23   refinance go to your account?

24   A.  That is correct.

25   Q.  Do you know how the defendant spent the money?

1   A.   No, I do not.

2   Q.   Now, I understand that you were hoping to have some

3   profits from this venture?

4   A.   Yes.

5   Q.   Were you later able to determine some of the ways in which

6   the defendant spent the money?

7   A.   Somewhat.  There was -- we went to Las Vegas to look at

8   some properties there.  This was right after that loan.  And

9   we didn't -- we didn't make any connections there.  And while

10  I -- we spent some money there.  I played golf one day and had

11  some dinners and stuff like that.

12  Q.   And did the defendant use money from that account to pay

13  for some of those matters?

14  A.   Well, I don't know.  He said he was.

15  Q.   And did you pay, in fact, your flight to Las Vegas?

16  A.   I paid my own, yes.

17  Q.   Otherwise you're not aware of how the defendant -- how the

18  money was spent --

19  A.   No.

20  Q.   -- that went into that JR Properties account?

21  A.   No, I didn't.

22  Q.   Generally speaking.

23  A.   Generally speaking, no.

24  Q.   Because these loans were in your name, mortgage payments

25  were due in your name?

Tkacz - P

201

1   A.   Yes.

2   Q.   Typically did you make those mortgage payments?

3   A.   I think once.  Once I did.  But most of the -- the

4   original idea was that the checks -- I'm sorry.  The bills

5   would have been paid through JR Properties account.

6   Q.   Okay.  And do you know how long those mortgage payments

7   were paid using JR Properties account funds?

8   A.   At least through January or February, as I remember.

9   Q.   Of 2007?

10  A.   Yes.

11  Q.   So just a matter of months.

12  A.   Yes.

13  Q.   Now, going back to the Ashlan refinance.  Did the -- did

14  Randy Wilkins present this refinance opportunity to you as a

15  good thing?

16  A.   Yes, he did.

17  Q.   And did he -- how did he describe it?

18  A.   Well, we're going to spend a lot of money re-doing the

19  house because it needed quite a bit of work -- I'm sorry, it

20  required a lot of work.  We had a couple of contractors come

21  in and do some work on the house.

22  Q.   Did he describe the -- but with respect to the refinance

23  and the money coming back, did he refer to that as a home run?

24  A.   Yes, he did.

25  Q.   Okay.  In what context -- could you explain that?

1    A.  It was based on what we were paying for the house.  And

2    once we had done all the reconditioning that we expected,

3    there would be a very large profit made when all was said and

4    done.  So yes, from the concept of, yes, we're going to make a

5    home run out of the deal.  Yes.

6    Q.  That's how he was presenting it to you?

7    A.  Yes.

8    Q.  Okay.  Do you know why mortgage payments were stopped very

9    shortly thereafter?

10   A.  From -- I was told that there was no more money in the

11   account.

12   Q.  When were you told that?

13   A.  I don't remember the exact date.  No.  It would have been

14   shortly -- I don't remember.  I don't remember.

15   Q.  Were the properties, all of the three properties

16   ultimately, did they go into foreclosure?

17   A.  Yes, they did.

18   Q.  Against you?

19   A.  Yes, they did.

20   Q.  So -- and the properties were foreclosed by the lenders?

21   A.  Yes, they were.

22   Q.  Because the payments weren't made when due.

23   A.  That's correct.

24   Q.  All right.  Now, let me ask you about three other

25   documents.  May I have one moment, Your Honor?

1       Mr. Tkac, I'm going to show you three documents.  And

2  first is a grant deed, Exhibit 1-E-25.  Do you see that?

3  A.  Yes, I do.

4  Q.  And is that your signature on that?

5  A.  Yes, it is.

6  Q.  And is it dated December 21st, 2006?

7  A.  Yes, it is.

8  Q.  And it's got a recording date of January 12th, 2007?

9  A.  Yes.

10  Q.  And does this indicate you're transferring property to

11  JR -- a property to JR Properties & Investments?

12  A.  Yes, it is.

13  Q.  I'm going to show you Exhibit 2-M, which is also a grant

14  deed.  Is that also signed by you?

15  A.  Yes, it is.

16  Q.  Is it dated December 21, 2006?

17  A.  Yes.

18  Q.  And this has you also granting property to JR Properties &

19  Investments?

20  A.  Yes, it is.

21  Q.  And then the third one is Government Exhibit 4-G.  And

22  does that have your signature on it as well?

23  A.  Yes, it does.

24  Q.  And is that also dated December 21st, 2006?

25  A.  Yes, it does.  Yes, it is.

1   Q.   And is that indicating that you're transferring property

2   to JR Properties & Investments?

3   A.   Yes.

4   Q.   Were these three grant deeds to transfer the ownership of

5   the three properties that you bought to JR Properties &

6   Investments?

7   A.   Yes, it was.

8   Q.   So the Adoline property, the Phillip Avenue property and

9   the Ashlan property?

10  A.   Yes.

11  Q.   Okay.  Who asked you to fill out these grant deeds or sign

12  the grant deeds?

13  A.   Randy.

14  Q.   Did he explain why he wanted you to sign the grant deeds?

15  A.   It would show that our proper -- or JR Properties would

16  show that it has credibility.  So that if we wanted to do some

17  more properties, that we would have that developed showing as

18  we are --

19  Q.   That -- he explained to you that it would --

20  A.   It would help us --

21  Q.   -- benefit JR Properties to have these in JR Properties'

22  name?

23  A.   Yes.

24  Q.   And not owned by you anymore directly?

25  A.   Yes, that's correct.

1   Q.  Now, the loans stayed in your name, though?

2   A.  Yes, they did.

3   Q.  And -- all right.  Nothing further, Your Honor.

4           THE COURT:  Cross.

5           MR. SCIANDRA:  Let me just have a moment, Your Honor.

6                        CROSS-EXAMINATION

7   BY MR. SCIANDRA:

8   Q.  Good morning, Mr. Tkac.

9   A.  Good morning.

10  Q.  Mr. Tkac, near the beginning of your direct examination,

11  you mentioned that you had a stroke?

12  A.  Yes.

13  Q.  I have no intention of getting personal.  I just have one

14  question in that regard.  Did that stroke in any way affect

15  your memory?

16  A.  No, not really.  No.

17  Q.  So you don't feel that the stroke has any bearing on your

18  ability to recall the events that occurred in 2006 and 2007

19  and testify --

20  A.  No.

21  Q.  -- concerning them in this case?

22  A.  No, I don't think so.

23  Q.  Okay.  Fine.  I just wanted to get that cleared up.

24  A.  Sure.

25  Q.  Now, can you tell us what your educational background is?

1  A.   I've got an undergraduate degree in -- at the Air Force

2  Academy.  And I've done some post-graduate work at University

3  of Nevada.

4  Q.   What is your undergraduate degree from the Air Force

5  Academy in?

6  A.   Aeronautical engineering.

7  Q.   Aeronautical engineering?

8  A.   Yes.

9  Q.   That's a pretty complicated field to study; isn't it?

10  A.   Yes, it is.

11  Q.   And do you have any idea what your class standing at the

12  Air Force Academy was?

13  A.   Yes.

14  Q.   What was it?

15  A.   Pretty low.

16  Q.   But you did graduate?

17  A.   Yes, I did.

18  Q.   And then did you go on to serve some time in the -- I make

19  it sound like incarceration.  Did you go on to serve our

20  country --

21  A.   Yes, I did.

22  Q.   -- in the Air Force?

23  A.   No, I was in the Marine Corps.

24  Q.   I'm sorry.  In the Marine Corps.

25  A.   Yes, sir.

1    Q.  And how long were you in the Marine Corps?

2    A.  Several years.

3    Q.  Several years?

4    A.  Yes.

5    Q.  All right.  And did you do graduate work at the University

6    of Nevada before or after you did several years in the Marine

7    Corps?

8    A.  It was after.

9    Q.  And in what area did -- excuse me.  What was your

10   assignment in the Marine Corps?

11   A.  I was a platoon -- I'm sorry, platoon --

12   Q.  Take your time, sir.

13   A.  Yes.  Finish.  Platoon -- I'm sorry.

14   Q.  Take your time.  There's no --

15   A.  Patrol -- I'm -- an officer.  Okay.

16   Q.  And what was the highest rank you achieved?

17   A.  Lieutenant.

18   Q.  And what was -- when you separated from the Marine Corps

19   you went to the University of Nevada, what area of studies did

20   you pursue there?

21   A.  I was in the department of physics.

22   Q.  Did you receive a postgraduate degree?

23   A.  No, I did not.

24   Q.  And how long did you pursue the area of physics?

25   A.  Two years.

Tkac - X

208

1   Q.   Now, when did you first meet Randy Wilkins?

2   A.   Probably 2004, 2003.

3   Q.   And how did you meet Randy Wilkins?

4   A.   Through work.

5   Q.   And your work was at Weber BMW?

6   A.   Yes, it was.

7   Q.   And did -- strike that.

8        Were you married at the time?

9   A.   Yes, I was.

10  Q.   And your wife's name is Patricia?

11  A.   Yes.

12  Q.   And how long have you been -- are you still married to

13  Patricia?

14  A.   Oh, yes, I am.

15  Q.   And how long have you been married to Patricia?  They call

16  her Pat or Patricia?

17  A.   Yes.  Pat.  Yes.  15 years.  16 years.

18  Q.   And did your family, you and Mrs. Tkac, become

19  very -- become friends with Randy and Janelle and their

20  children?

21  A.   Yes, I did.

22  Q.   And you became pretty close friends; isn't that correct?

23  A.   Yes, we did.

24  Q.   And as a matter of fact, you were referred to by Randy and

25  Janelle Tkac as dad?

1   A.  Yes.  They -- yes.

2   Q.  And you were -- you were referred to by the Wilkins'

3   children as Grandpa Joe?

4   A.  Yes, I was.

5   Q.  And your wife Patricia was referred to by the Wilkins'

6   children as Grandma Pat?

7   A.  Yes.

8   Q.  So it was a pretty close familiar relationship?

9   A.  Yes, we were.

10  Q.  And would you consider yourself a mentor for Mr. Wilkins

11  at that time?

12  A.  I don't think so, no.  No.

13  Q.  Well, I mean, did you give him counseling and advice --

14  A.  Yes.

15  Q.  -- on issues?

16  A.  Yes.  Yes.

17  Q.  Okay.  And would that be true for your wife as far as

18  raising the Wilkins' children?

19  A.  I don't think so, no.  No.

20  Q.  Now, at some point Mr. Wilkins left Weber BMW; correct?

21  A.  Yes, he did.

22  Q.  And he was terminated?

23  A.  Yes.

24  Q.  If you -- and please don't answer these questions unless

25  you actually know the answer.  I'm not trying to have you

1  guess at anything.

2  A.  I know.  I understand.

3  Q.  So Mr. Wilkins was terminated from Weber BMW.

4  A.  Yes.

5  Q.  And from your knowledge, Mr. Wilkins filed a lawsuit

6  concerning that termination; correct?

7  A.  Yes.

8  Q.  And after he was terminated from Weber BMW, he moved to

9  Santa Rosa; correct?

10  A.  Yes.

11  Q.  And you kept in contact with him to some degree; didn't

12  you?

13  A.  Oh, yes.

14  Q.  And you were aware that he went to work for -- and you may

15  know the name -- a BMW dealer in Santa Rosa?

16  A.  Yes, I do.

17  Q.  Did you become aware at some time that Mr. Tkac -- excuse

18  me, Mr. Wilkins settled that lawsuit against Weber BMW?

19  A.  Yes, I did.

20      MR. SHERRIFF:  Objection.  Calls for hearsay.  Move

21  to strike.

22      MR. SCIANDRA:  I asked if he became aware.

23      THE COURT:  Wait just a second.  I can't make that

24  determination.  It's premature.  So it's overruled without

25  prejudice.

1          MR. SCIANDRA:  Okay.

2     Q.  How did you become aware -- strike that.

3          Did you become aware that Mr. Tkac settled -- Mr.

4     Wilkins settled that lawsuit?

5     A.  He told me --

6          THE COURT:  Just a minute.  Yes or no.  Did you

7     become aware is the question.

8          THE WITNESS:  Yes.

9     BY MR. SCIANDRA:

10    Q.  And how did you become aware?

11         MR. SHERRIFF:  I'm going to object to that question

12    as calling for hearsay.

13         THE COURT:  That's the problem.  I need the answer

14    before I can make that determination.  How did you become

15    aware?

16         THE WITNESS:  He told me.

17         THE COURT:  He who?

18         THE WITNESS:  Randy Wilkins.

19         MR. SCIANDRA:  Your Honor, it's not for the truth of

20    the matter.  It's for why subsequent events occurred.  I'll be

21    proving that independently.

22         THE COURT:  All right.  With regard to this

23    questioning, these questions and the answers, this witness is

24    indicating that the defendant told him something about this

25    lawsuit and the settlement of it.  That is not being offered,

1   nor is it being accepted by the Court as being true.  That's

2   not why it's being offered.  It is simply to explain,

3   apparently, why this witness or some other person did what

4   they did based on that information.  True or not.

5           Does anybody wish me to explain it further?

6           Okay.  Go ahead.

7           MR. SCIANDRA:  Thank you, Your Honor.

8   Q.  I think we left off Mr. Wilkins told you that he had

9   settled his lawsuit.

10  A.  Yes.

11  Q.  And did he tell you how much he settled it for?

12          MR. SHERRIFF:  Your Honor, again, I'm going to object

13  to the line of questioning.

14          MR. SCIANDRA:  I'll withdraw the question.  I'll

15  withdraw the question.

16          THE COURT:  Withdrawn.

17  BY MR. SCIANDRA:

18  Q.  Did Mr. Wilkins return to the Fresno area?

19  A.  Yes, he did.

20  Q.  And when he returned to the Fresno area, he contacted you;

21  correct?

22  A.  Yes.  Yes.

23  Q.  And at some point relatively shortly after he returned to

24  the Fresno area, he discussed with you the possibility of

25  working for him in a used car lot; correct?

1   A.  Yes, he did.

2   Q.  He was telling you that he wanted to purchase an interest

3   in a used car lot in Fresno.

4   A.  Yes, he did.

5   Q.  And you were going to work for him?

6   A.  Yes.

7   Q.  And did that ever happen?

8   A.  No, it did not.

9   Q.  Was it about this time that Mr. Wilkins brought up the

10  idea of forming a partnership to purchase, refurbish and

11  resell homes?

12  A.  Yes, he did.

13          MR. SCIANDRA:  Excuse me.

14          MR. SHERRIFF:  Your Honor, can we take this

15  opportunity to have a brief sidebar?

16          THE COURT:  On?

17          MR. SHERRIFF:  On an issue about --

18          THE COURT:  No, no, I meant on the record.

19          MR. SHERRIFF:  It doesn't have to be on the record.

20          (There was a discussion between the Court and counsel

21          at sidebar, as follows:)

22          THE COURT:  We're on the record because you don't --

23          MR. SCIANDRA:  That's fine.

24          THE COURT:  We'll just remain on the record.  That's

25  fine.  Wait a minute.  Counsel are present.  The defendant is

1    not.  Are you waiving his presence?

2         MR. SCIANDRA:  Oh, yes, Your Honor, I'm sorry.

3         MR. SHERRIFF:  I don't know if I've got where defense

4    counsel is going, but my concern is that he cannot get out the

5    defendant's self-serving statements to Mr. Tkac as

6    self-serving, exculpatory or whatever statements to Mr. Tkac

7    because I'm going to be objecting on hearsay grounds.  What

8    he's trying to get out is the defendant's story through this

9    witness.  We can bring out the defendant's statements to Mr.

10   Tkac as statements of co-conspirator.  Statements of party

11   opponent.  He cannot bring out Mr. Wilkins statements to Mr.

12   Tkac.  He can put Mr. Wilkins on and testify to those

13   statements.

14        THE COURT:  My understanding of what he's doing is

15   he's setting it up so explain why this witness did what he

16   did.

17        MR. SHERRIFF:  That's fine.  If it's purely for that

18   purpose.  But that would require very limited questioning as

19   to a specific thing that was said and then what Mr. Tkac did

20   in response.  And I am kind of getting a little feeling that

21   we're heading into Mr. Wilkins side of the story as to what

22   Mr. Wilkins was presenting.  That's got to come in through Mr.

23   Wilkins, not through this witness.

24        THE COURT:  I understand.  I'm sure you do too.

25        MR. SCIANDRA:  I appreciate the evidence 101 lesson,

Tkac - X

215

1   but I understand that's the law and that's what I intend to

2   do --

3              MR. SHERRIFF:  Okay.

4              MR. SCIANDRA:  -- is follow that law.

5              MR. SHERRIFF:  Thank you.

6              THE COURT:  All right.

7              (The following proceedings were held in open court:)

8   BY MR. SCIANDRA:

9   Q.  Mr. Tkac, I believe we left off with the genesis of the

10  idea to start this JR Properties; correct?

11  A.  Yes.

12  Q.  Now, jumping ahead.  As a result of your association with

13  JR Properties, you ended up pleading guilty to a charge of

14  conspiracy to commit bank fraud; is that correct?

15  A.  Yes, I did.

16  Q.  And as part of that -- or strike that.

17             There was a plea agreement; was there not?

18  A.  Yes, there was.

19  Q.  And in this plea agreement, you agreed to cooperate with

20  the government in order to earn a lighter sentence; isn't that

21  correct?

22  A.  No.  Not specifically, no.

23  Q.  Do you recall when you entered into this plea agreement

24  that you were shown a document and that document was called

25  plea agreement?

1   A.   Yes.  I've seen that.

2   Q.   It was several pages long.

3   A.   Yes.

4   Q.   Now -- may I approach the witness, Your Honor?

5           THE COURT:  Sure.  Is this marked or not marked?

6           MR. SCIANDRA:  This is not marked yet, Your Honor.

7   It would be Defense Exhibit E.

8           THE COURT:  E?

9           MR. SCIANDRA:  Yes.  And I have a copy for the Court.

10          THE COURT:  Is this an 11(c)?

11          MR. SCIANDRA:  Yes, Your Honor, it is.

12          THE COURT:  Thanks.

13          (Defendant's Exhibit E was marked for

14          identification.)

15  BY MR. SCIANDRA:

16  Q.   Do you recognize that document, Mr. Tkac?

17  A.   Yes.  Yes, I have.

18  Q.   Now, when you appeared before this Court, Judge

19  O'Neill -- or strike that.  You appeared before Judge O'Neill

20  to enter that plea; did you not?

21  A.   No, I did not.

22  Q.   Who did you appear before?

23  A.   The other --

24  Q.   Judge Ishii?

25  A.   No.  It was the judge that just retired.

1              THE COURT:  Judge Wanger?

2    BY MR. SCIANDRA:

3    Q.  Judge Wanger?

4    A.  Wanger, yes.

5    Q.  When you appeared before Judge Wanger, Judge Wanger asked

6    you if you had read this plea agreement; didn't he?

7    A.  Yes, I did.  Yes.

8    Q.  Did you read the plea agreement?

9    A.  Yes, I did.

10   Q.  And did you understand the plea agreement?

11   A.  Yes.

12   Q.  All right.  And is this a true and accurate copy of that

13   plea agreement?  You can thumb through it to make that

14   determination.

15   A.  It looks familiar.  I mean, it looks like it was, yes.

16          MR. SCIANDRA:  Okay.  Your Honor, I'd ask to admit

17   Defense Exhibit E, the 11(c) plea agreement.

18          MR. SHERRIFF:  No objection.

19          THE COURT:  It's received.

20          MR. SCIANDRA:  Thank you, Your Honor.

21          (Defendant's Exhibit E was received.)

22   BY MR. SCIANDRA:

23   Q.  Now, it's divided up into many sections; is that correct?

24   A.  Yes.

25   Q.  And one of the sections is agreements by the government.

1   Is that correct?

2   A.  Which number?

3   Q.  Look at page 8, paragraph 5.  Do you see where there's a

4   section that says "Agreements by the government"?

5   A.  I'm sorry.  I really don't see what we're looking at here.

6   Q.  Turn to page 8.

7          THE COURT:  Here, why don't you -- oh, you've got the

8   binder or -- here.  Here.  Could you just hand me your copy,

9   please?

10          THE WITNESS:  Sure.

11          THE COURT:  That's the page he's looking at right

12   there.  Bottom half.

13          THE WITNESS:  Okay.

14   BY MR. SCIANDRA:

15   Q.  All right.  So now you found that; correct?

16   A.  Yes, I have.  Yes.

17   Q.  Let's move to the next page, which would be page 9.

18   A.  Yes.

19   Q.  At the top of page 9, it states, "If the government

20          determines that the defendant has provided

21          substantial assistance to law enforcement authorities

22          and has complied with his obligations pursuant 4(j)

23          of the plea agreement, the government will move for

24          and recommend, pursuant to 5K1 of the Sentencing

25          Guidelines and/or pursuant to Rule 35 of the Federal

Case 1:12-cr-00039-LJO-BAM   Document 59   Filed 12/18/13   Page 61 of 77

1          Rules of Criminal Evidence a reduction from the

2          applicable" --

3          MR. SHERRIFF:  It says "criminal procedure," Your

4  Honor.

5          THE COURT:  I'm sorry, what?

6          MR. SCIANDRA:  "Criminal procedure a reduction from

7          the applicable guideline sentence.  The defendant

8          understands that it is within the sole and exclusive

9          discretion of the government to determine whether the

10         defendant has provided substantial assistance."

11 Q.  Now, what does that mean to you?

12 A.  It means that I should be truthful in whatever we're

13 doing, yes.

14 Q.  Doesn't it also mean to you that the better you do for the

15 government, the more likely they will recommend a sentence

16 reduction?

17 A.  I don't see that, no.

18 Q.  Doesn't it mean that if the government decides that you

19 have been -- that you have given substantial assistance, that

20 they will recommend a sentence reduction?

21 A.  It says that "at the exclusive discretion."  So it doesn't

22 say that, no.

23 Q.  It says that the government has the sole authority to --

24 A.  Yes.

25 Q.  -- recommend a sentence reduction; correct?

1   A.  Yes, it does say that.

2   Q.  Would you say it would be fair to characterize that as if

3   you don't produce, you don't get a reduction in your sentence?

4   A.  I couldn't say that, no.

5   Q.  Now, in this plea agreement, you were made aware that the

6   amount of restitution you were agreeing to is approximately

7   $700,000; correct?

8   A.  Yes, I did.

9   Q.  And you were told that you would be responsible for that

10  $700,000 on some period of supervised release; isn't that

11  correct?

12  A.  Yes.

13  Q.  Were you also told that if there were co-defendants that

14  were convicted of this charge, that they would be equally

15  responsible for that $700,000?

16  A.  I remember -- I think so, yes, yes.  Yes.

17  Q.  Now, I want you to turn to page 10.

18       Now, on page 10, at paragraph 6, do you see that

19  factual basis?

20  A.  Yes.

21  Q.  And basically that is a statement of the facts underlying

22  your plea of guilty; correct?

23  A.  Yes.

24  Q.  And that statement of facts was prepared by the

25  government, to the best of your knowledge; wasn't it?

1    A.   Yes.

2    Q.   And you reviewed that statement of facts?

3    A.   Yes, I did.

4    Q.   And do you have that in mind, the contents of that

5    statement of facts?

6    A.   Yes, I did.

7    Q.   You do at this time?

8    A.   Yes.

9    Q.   And isn't it true that that statement of facts essentially

10   says that you were aware of all of the misstatements and the

11   fraudulent statements in the various loan applications to the

12   various lending institutions when you were buying these three

13   properties.  Is that correct?

14   A.   No, not completely.  No.

15   Q.   Okay.  Well, what is your interpretation of it then?  You

16   can take a moment and read it over.

17   A.   Well, I'm -- I didn't go completely through every

18   application.  I was told by Randy and also through --

19   Q.   Excuse me, sir.  I'll have to interrupt you.  I'm saying

20   what your understanding --

21          MR. SHERRIFF:  Your Honor, I'd ask that the witness

22   be allowed to complete his answer.

23          THE COURT:  Well, the question is:  "What is your

24   interpretation of it then?"

25          MR. SCIANDRA:  And that was not responsive.

1      THE COURT:  Just a second.  Yeah, he's not asking you

2    what anybody else told you.  He's asking you what is your

3    interpretation of what that factual pattern or statement

4    means.

5    BY MR. SCIANDRA:

6    Q.  And you may take the time you need to review --

7    A.  Well, I'm trying to put it in my mind.  I had somewhat

8    knowledge of everything that was done, yes.

9    Q.  You had somewhat knowledge?

10   A.  Yes.

11   Q.  That's your interpretation?

12   A.  Yes.

13   Q.  Now I'd like you to turn to page 12 of the plea agreement.

14   You understood -- excuse me.  You haven't gotten there yet.

15   A.  I've got it.

16   Q.  I want you to look at paragraph 7.

17   A.  Yes.

18   Q.  Potential sentence.

19   A.  Yes.

20   Q.  And according to this plea agreement, you understood at

21   the time you entered the plea agreement, that you were facing

22   a maximum of 30 years in prison; correct?

23   A.  That's correct.

24   Q.  Now, when you agreed to cooperate with the government and

25   testify against Mr. Wilkins, if necessary, your purpose was to

1  try and get the lightest sentence you possibly could; isn't
2  that true?
3  A.  Not necessarily, no.
4  Q.  Well, then what was your reason?
5  A.  Because I wanted to get the truth of this whole thing out
6  is what I wanted.
7  Q.  So your motivation was to get the truth out, not to get a
8  lighter sentence for yourself?
9  A.  Not specifically, no.
10  Q.  Would you say your primary motivation was just to get the
11  truth out?
12  A.  Yes, it was.
13  Q.  And your primary motivation was not to get a lesser
14  sentence?
15  A.  It was not.
16  Q.  So you're not as concerned about what your sentence is
17  going to be as you are about getting the truth out?
18  A.  That's correct.
19  Q.  Now, your -- were you made -- strike that.
20      You were contacted by the FBI; correct?
21  A.  Yes, I was.
22  Q.  You didn't go to the FBI and say, "You know what?  I'd
23  like to tell you about something illegal that went on that I
24  was involved about because I want to get the truth out?"
25  A.  No, I did not.

Case 1:12-cr-00039-LJO-BAM   Document 59   Filed 12/18/13   Page 66 of 77

1   Q.  So you weren't concerned -- or strike that.  That's not

2   fair.

3           You did not actively attempt to get the truth out

4   until the FBI knocked on your door; correct?

5   A.  No, I did not.

6   Q.  And when the FBI knocked on your door and they told you

7   what they were there for, you were pretty concerned --

8   A.  Of course.

9   Q.  -- wouldn't that be fair to say?

10  A.  Of course.

11  Q.  At that time, were you concerned more about what could

12  happen to you or were you concerned more about getting the

13  truth out?

14  A.  At that point, it was -- I was more concerned about what

15  was going on with me.  Yes.

16  Q.  And did you tell the FBI agents, in the initial interview,

17  did you tell them the truth?

18  A.  As I remember.

19  Q.  So you know that -- well, since Martha Stewart, I think we

20  all know that it's a felony to lie to the FBI; correct?

21  A.  I assume so, yes.

22  Q.  Well, did you know that at the time that you gave your

23  first statement to the FBI?

24  A.  No.

25  Q.  Did you tell the FBI the complete truth the first time you

225

1   spoke to them?

2   A.  I thought I did.  I don't remember.

3   Q.  Did you tell the FBI that you didn't know that your

4   personal assets were inflated on these applications, inflated

5   to the amount of $100,000?

6   A.  I don't remember.

7           MR. SCIANDRA:  Your Honor, may I approach the

8   witness?

9           THE COURT:  Sure.  What's your time estimate?

10          MR. SCIANDRA:  My time -- quite a while, Your Honor.

11          THE COURT:  Okay.  Why don't we take 15-minute mid

12  morning break.  Ladies and gentlemen, please remember, don't

13  discuss the case and at 10:20 we'll come back and finish with

14  this witness.  10:20.

15          (The jury left the courtroom.)

16          MR. SCIANDRA:  Can we stay on the record just a

17  moment?

18          THE COURT:  Yes.  Okay.  The jury has left.

19          MR. SCIANDRA:  Yes, Your Honor.  I just wanted the

20  record to reflect that I was going to show Mr. Tkac the

21  various interviews that he had with the FBI so that he can

22  review them during the break.

23          THE COURT:  Good.  That will save some time.

24          MR. SCIANDRA:  Yes.  Thank you.

25          THE COURT:  All right.  We'll be in recess.  15

1    minutes.

2            (Recess.)

3            THE COURT:  Back on the record.  Counsel are present.

4    Defendant is present.

5            For the record, we have received information that Mr.

6    Sciandra, defense counsel's mother has passed away.  And

7    obviously, we're not going to proceed with trial today.  What

8    is anyone's position with regard to this case?

9            MR. SCIANDRA:  Your Honor, on behalf of Mr. Wilkins.

10   And I discussed this matter with him.  Given the events and

11   their effect on me, I would not be able to proceed.  And

12   because of being responsible for making the arrangements and

13   cleaning up affairs, I am going to move for a mistrial,

14   requested by the defense and concurred in by Mr. Wilkins.

15           THE COURT:  Let me ask you first a question, Mr.

16   Sciandra, and then I wish to ask your client a couple of

17   questions.

18           The question for you is:  Based on this news that you

19   just received, do you feel as though you are in a state of

20   mind where you can make the decision and do the analysis of

21   what you're requesting?

22           MR. SCIANDRA:  I believe I am.  Although I feel I

23   can't proceed forward with --

24           THE COURT:  No, no, I'm not asking you --

25           MR. SCIANDRA:  I believe that I am, Your Honor.

1          THE COURT:  Okay.  Mr. Wilkins, you understand that

2     there are criminal charges against you pending, obviously.

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  And there is a motion that's been brought

5     by your attorney.  I'm sure that he has talked to you.  And

6     I'm not asking to invade the attorney/client privilege.  But

7     I'm sure he's talked to you about the issues that are involved

8     with requesting that a court declare a mistrial.  There are

9     certain considerations, such as continuity in the jurors'

10    minds.

11         I'm sure he's discussed with you the fact that when a

12    jury is recessed -- a jury trial is recessed for a week or

13    week and a half, it would probably be at least a week and a

14    half because today's Thursday, your attorney has to get down

15    to southern California to make arrangements.  And I would

16    assume that there is going to be some type of a service, a

17    funeral service next week sometime.  And the other things that

18    he has to attend to down there.  That we would not be coming

19    back for trial until the earliest a week from Tuesday.

20    Because a week from Monday, I have my criminal calendar all

21    day.

22         We don't know how those sorts of things play in the

23    minds of jurors.  In other words, are they left thinking and

24    fermenting the issue of the prosecutor's case or is it a

25    good -- that would be bad probably for you.  Or is it a good

1   thing that they would begin to forget things?  I just don't

2   know.  And nobody does.  It's all speculation.  But these are

3   concerns.

4          Do you understand that if you are joining in --

5   giving your attorney permission and joining in with this

6   motion for a mistrial, that you are giving up any right to

7   claim in an appellate court, before this Court or an appellate

8   court, an issue of double jeopardy when we start your next

9   trial?

10          THE DEFENDANT:  Yes, I understand that.

11          THE COURT:  And do you have any questions about it?

12          THE DEFENDANT:  As far as double jeopardy?  No, sir.

13          THE COURT:  You understand you're giving up that

14   appellate right, if there was an appellate right to be had.

15   That would be -- there would be many things that would have to

16   happen, such as my granting this motion, such as the -- there

17   being a motion brought or an appeal brought before the Ninth

18   Circuit.  But the bottom line is you are waiving any type of

19   right you might have to claim double jeopardy if I grant this

20   motion since you're joining in.  Do you understand that?

21          THE DEFENDANT:  Regarding what's transpired here, but

22   not later when we continue a new trial; correct?

23          THE COURT:  No.  Double jeopardy would be gone.

24          THE DEFENDANT:  Forever?

25          THE COURT:  Well, unless I --

1          MR. SCIANDRA:  May I have a moment with him?  I think

2     he doesn't understand.

3          THE COURT:  Yes, go ahead.

4          (Discussion between Mr. Sciandra and the defendant,

5              not reported.)

6          THE DEFENDANT:  I understand now, Your Honor.  I

7     wasn't clear on that.

8          THE COURT:  Okay.  You understand that as a result of

9     this motion, if I grant this motion that your attorney has

10    brought and you are agreeing to have him bring on your behalf,

11    that if I grant this motion, when -- I will obviously set a

12    new trial date.  And when we -- we will be starting a new

13    trial.  And there will not be a double jeopardy argument that

14    will be entertained because it will be given up, it will be

15    waived by the fact that you're joining in this motion.

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Is that what you wish to do?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  Do you have any questions at all of your

20    attorney or of me with regard to what we're doing?

21         THE DEFENDANT:  No, sir.

22         THE COURT:  What's the government's position?

23         MR. SHERRIFF:  The government's position, Your Honor,

24    is we're prepared to proceed with trial either today or at

25    any -- as soon as possible thereafter.

1      If the Court is inclined to grant defendant's motion,

2  which the government is not joining in, is not joining in,

3  just would ask that the Court consider or make a finding as to

4  whether it's considered alternatives, a finding as to whether

5  the defendant's motion is required to be granted because of

6  manifest necessity and a ruling as to whether the ends of

7  justice are served by the granting of defendant's motion.

8      THE COURT:  Okay.  Anything else?

9      MR. SHERRIFF:  No, Your Honor.

10      THE COURT:  Do you wish to be heard?

11      MR. SCIANDRA:  No.

12      THE COURT:  All right.  The Court finds that under

13  these circumstances, obviously, we -- just like everyone else,

14  we deal with horrible losses.  And the loss of a parent is

15  certainly in that category.  And there is no way, obviously,

16  that Mr. Sciandra can continue on with this case.  He doesn't

17  want to.  I'm sure his client doesn't want him to.  The Court

18  doesn't want him to based on what I'm seeing with regard to

19  the emotional reaction.  And that's certainly justified

20  totally.

21      Based on the reality, as I indicated just now to Mr.

22  Wilkins, there is little, if any, chance that this case would

23  begin again until a week from Tuesday, which is 11 days away.

24  And I don't think that's fair to anybody.  I don't think it's

25  fair to the defendant.  I don't think it's fair to the

1   prosecutor.  And I certainly don't think it's fair to the

2   jurors to put them in that situation.

3          The Court does find that there is manifest injustice

4   if I continue with this case over the objection of the defense

5   and in light of their motion for mistrial.  The Court does

6   find that in the interest of justice, the motion should be

7   granted and the Court does grant the motion for mistrial.

8          I'm going to bring the jury out now and I'm going to

9   explain to them what has happened.  Mr. Sciandra, if you don't

10  want me to mention your name, I can just simply say one of

11  counsel's parents has passed.

12          MR. SCIANDRA:  I'd request that, Your Honor.

13          THE COURT:  Okay.

14          MR. SCIANDRA:  If that's agreeable with the

15  prosecution.

16          MR. SHERRIFF:  No objection, Your Honor.

17          THE COURT:  Anything else?

18          MR. SCIANDRA:  No, Your Honor.

19          MR. SHERRIFF:  No, Your Honor.

20          Your Honor, after the jury is excused, we would ask

21  to address the issue of a subsequent trial date.

22          THE COURT:  Of course.

23          MR. SHERRIFF:  Okay.

24          MR. SCIANDRA:  Your Honor, I'm going to request that

25  the matter be set for status hearing rather than setting a

1   trial date today because I have a very complicated calendar on

2   my other capital case.

3           THE COURT:  Any objection to that?

4           MR. SHERRIFF:  I don't --

5           THE COURT:  We'll probably set it a week from Monday.

6           MR. SHERRIFF:  I think that's fine.

7           THE COURT:  Okay.

8           (The jury entered the courtroom.)

9           THE COURT:  Let the record reflect that the jury has

10  joined us.  Ladies and gentlemen, I'm well aware that you've

11  been sitting back in the jury room for quite some time.  But I

12  think, based on what I'm going to tell you, you'll understand

13  that it was for good reason.

14          During -- right at the end of the session, right at

15  the beginning of the recess that we just took, one of the

16  attorneys was notified that his mother has just died.  And

17  obviously, under these circumstances, we can't go forward.

18  And so I have taken care of the matter on the record from a

19  legal standpoint.  And I have declared a mistrial.  It's not

20  fair to either side for a lengthy delay, especially when we

21  don't know when we could possibly, frankly, emotionally move

22  forward.  And it's also not fair to you.  We made certain

23  representations to you when we selected you as the jury.  And

24  we keep our promises.  We don't just inconvenience you when

25  things happen.  But the law is, fortunately, flexible enough

1   to deal with these sorts of emergencies that don't come up

2   often.  But when they come up, we do what we think is the

3   right thing.  And that's why I have declared this to be a

4   mistrial.

5         That does not take away from what you have done and

6   it does not take away from the fact that you were willing to

7   sit as jurors, to take the constitution seriously and to take

8   away from your personal lives no matter what the cost.  And I

9   appreciate that.  And on behalf of the judges and the parties

10   and counsel, we want to thank you for that.

11         Now, you are released not just from this case, you're

12   released from the admonition not to discuss the case.  You can

13   talk to anybody you want to about it.  Or not.  That's your

14   decision.  And I will tell you that, as I promised, once you

15   are sworn, once you are done, and you are now done, you are

16   free from the federal system and your jury duty here.

17         We also have a reciprocal agreement with your -- the

18   counties where you live, the state courts.  So if you're

19   called for jury duty in the next year, you will not have to

20   serve if you don't wish to.  You simply say that you have

21   served.  You have sat on a jury, which you have.  And if they

22   want to check out and verify, they know where our jury

23   commissioner is.

24         That doesn't mean you're disqualified.  In other

25   words, if you want to serve in the next year, if you get a

1   subpoena for jury duty in the state court, you certainly can.

2   But if you don't wish to, as I said, this would be an excuse.

3   Any questions?

4          All right.  If you'd return to the jury room, please,

5   and put your jury badges and your notebooks on the table.

6   You're free to go about your personal business.  And we thank

7   you very much for being here.

8          (The jury left the courtroom.)

9          THE COURT:  All right.  How about November 25th,

10  which is a week from Monday, at 8:30 for trial setting

11  conference?

12         MR. SCIANDRA:  That's fine, Your Honor.

13         MR. SHERRIFF:  That's fine, Your Honor.  I -- the one

14  concern with setting it out a bit is -- and I understand that

15  may be the most realistic date to set the status conference.

16  Is that we would like to fit this in by the end of the year.

17  I don't know if that's -- that's getting kind of tight.

18         THE COURT:  We'll accommodate and do whatever we need

19  to do on the Court's side.  You just let me know on that date

20  when you take a look at your calendars and see what we can do.

21         MR. SHERRIFF:  Possibly maybe realistically would be

22  just after the new year.  But --

23         THE COURT:  Okay.  Well, as I say, we'll work it out.

24  And I'll call you first on calendar on that day so that we get

25  you in and out.  It won't take long to select a date.

235

1          MR. SHERRIFF:  Okay.  Thank you, Your Honor.

2          MR. SCIANDRA:  And I'll try and work with counsel in

3    selecting a date prior to that so we don't have -- try and

4    avoid any kind of argument on the record about it.

5          THE COURT:  Okay.  That's fine.  Well, good luck, Mr.

6    Sciandra.  It's going to be a tough road.

7          MR. SCIANDRA:  Thank you, Your Honor.

8          MR. SHERRIFF:  Yes.

9          THE CLERK:  Judge can we take a stipulation to return

10   the exhibits until the next trial date?

11         THE COURT:  Any problem with that?

12         MR. SHERRIFF:  No.

13         MR. SCIANDRA:  I didn't hear?

14         THE COURT:  Giving you your exhibit binders back and

15   you keep track of them until time for us to have them again.

16         MR. SCIANDRA:  Yes, Your Honor.  So stipulated.

17         THE COURT:  Okay.

18         (The proceedings were concluded at 10:58 a.m.)

19

20         I, KAREN HOOVEN, Official Reporter, do hereby certify

21   that the foregoing transcript as true and correct.

22

23   DATED:  18th of December, 2013     /s/  Karen Hooven
                                        KAREN HOOVEN, RMR-CRR
24

25